## BOWLES *v.* LANDAFF.

The federal conscription act of March 3, 1863, did not put upon towns a duty of raising men or . money for the war, and did not require or authorize that duty to be put upon them.

Persons liable to be drafted under that act were federal militia.

The militia drafted under that act in September, 1863, were called forth by the draft to perform their duty of federal service.

The expense of obtaining substitutes for militia-men then called out cannot be unequally divided among the towns by the legislature, or by a municipal exercise of delegated legislative power.

ASSUMPSIT, to recover $300 commutation-money paid by the plaintiff to avoid entering the military service of the United States under a draft. Writ dated May 26, 1875. The declaration sets forth, that in 1863 the plaintiff was a citizen of said Landaff, and on the first day of September in that year was drafted into the military service of the United States, to fill the quota of said town; that to escape entering said service, the plaintiff was compelled to pay and did pay the sum of $300 as commutation-money for said service, no part of which has ever been repaid to him by said town, by this state, or by the United States; that at its annual meeting in March, 1864, an article being inserted in the warrant for that purpose, said town voted " That the selectmen are hereby instructed to pay the following persons [naming the plaintiff among others] the sum of $300 each, being the amount due them from the town as a matter ·of justice." To this declaration there was a general demurrer.

At the June session of the legislature, 1874, the following act was passed: "Any town, at any annual meeting duly notified and

holden, an article being inserted in the warrant for that purpose, may by vote raise and appropriate, or borrow and appropriate, money to reimburse and repay to any persons who, whether drafted or not during the recent civil war, furnished substitutes in the military service of the United States as part of the quota of such town, or who paid commutation-money instead of military service as part of the quota of such town, such sums of money as were paid by such persons for said purposes more than they have received from such town, or the state, or United States; and any vote heretofore passed by any town, at any annual meeting duly notified and holden, an article being inserted in the warrant for the purpose, to reimburse or repay to such persons such sums of money as were paid by them for said purposes more than they have received from such town, or the state, or United States, is hereby ratified and confirmed, and made legal and binding upon such town and the authorities thereof: *Provided, however,* that no town that has voted or shall vote to reimburse or repay the sums paid by any persons for the purposes aforesaid shall hereafter have or make any claim upon the state to reimburse such town for the sums that such town may pay to such persons in accordance with such vote."

*Carpenter,* for the defendants.

I. The vote of the town in March, 1864, was simply and absolutely void. It conferred no right upon the plaintiff, and subjected the town to no liability. It is incapable of confirmation. *Loyd* v. *Lee,* 1 Strange 94; *State* v. *Richmond,* 26 N. H. 232.

II. The act of 1874, in so far as it undertakes to ratify, confirm, and make legal and binding upon the town, the said vote of 1864, is retrospective and void. Bill of Rights, Art. 23; *Bristol* v. *New Chester,* 3 N. H. 533–535; *Roby* v. *West,* 4 N. H. 287; *Clark* v. *Clark,* 10 N. H. 380; *Towle* v. *Railroad,* 18 N. H. 547; *Willard* v. *Harvey.* 24 N. H. 344; Morr. Dig. 160 *a.*

III. But the act is unconstitutional in its prospective operation. The legislature cannot authorize towns to appropriate the public moneys to any other than public uses. It cannot authorize them to tax citizens for the benefit of one or more individuals. The effect of the law is to empower towns by vote to give a certain sum of money to certain persons, and thus to make taxation unequal, unjust, and oppressive. Bill of Rights, Arts. 10, 12; Const., Arts. 5, 6; *Opinion of the Justices,* 4 N. H. 565.

*Bingham & Mitchell,* for the plaintiff.

I. In the object for which the $300 was exacted and paid, viz., to assist in and contribute to the suppression of the Rebellion, every citizen and tax-payer in the defendant town had an equal interest with the plaintiff. The government that was imperilled was not

for the protection of any one individual or class of individuals, consequently the burden of upholding it did not fall entirely upon any one class of individuals or kind of property, but upon all, according to their means and ability. The defendants' vote in 1864 shows conclusively that they regarded it as a duty incumbent upon them to share with the plaintiff the burden he was temporarily compelled to assume on account of the conscription laws of the United States. The vote is also a recognition of the town's sense of the right and propriety of uniformity in bearing burdens which were purely for the public good.

II. It is objected that the act of 1874 is unconstitutional, being in its operation and effect retrospective, and so in conflict with Art. 23 of the Bill of Rights. That article declares, "Retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes or the punishment of offences." It is apparent that the laws contemplated by the framers, and the passage of which the people by this article of the constitution inhibited, were those only which are in their nature, effect, and operation "highly injurious, oppressive, and unjust." This law is not of that description. It simply enables the town to perform what they considered an act of justice and their duty. It perfects the plaintiff's remedy, by which he can compel his fellow-townsmen to share with him a burden incurred by him for their common good. It secures uniformity and equality in bearing burdens for the public good. The effect and operation of the law are in every respect entirely consistent with justice.

III. This law being applicable to a civil cause, to be inhibited by this clause and afford no relief in this case must be for "the decision of" it. Does it decide this cause, in contemplation of the framers of the constitution? If it does not decide it, or is not for its decision, the law is not unconstitutional. Retrospective laws, as interpreted by our courts and the courts of other jurisdictions, are such as destroy or interfere with vested rights. A law which provides a new or additional remedy is not unconstitutional. The right here involved was not in any way interfered with by the statute. It existed as truly and justly before the statute as it does now. The rules by which that right was to be determined, the standard of right and wrong between the parties, the law did not change. The law gave the plaintiff a remedy to enforce an existing right. It gave the defendants authority to act in accordance with their expressed will. It deprived the defendants of no right, but granted them a privilege. *Willard* v. *Harvey*, 24 N. H. 244; *Rich* v. *Flanders*, 39 N. H. 304; 1 Kent Com. 455.

IV. It is also contended that the act, in its prospective operation, is unconstitutional, on the ground that the legislature cannot authorize towns to appropriate public moneys for other than public uses.

The use for which the money was appropriated or authorized by this statute is public. It is an appropriation for " public uses," as much as appropriations for the support and benefit of indigent persons, insane persons, and other classes of destitute and unfortunate persons. The constitutionality of laws making or authorizing appropriations for these purposes is never questioned.

It is also an appropriation for public use, and of the same class as those made and authorized to pay bounties to soldiers who volunteered, and to pay the commutation-money of those who might be drafted. The constitutionality of acts authorizing these appropriations has never been questioned. *Crowell* v. *Hopkinton*, 45 N. H. 9; *Stone* v. *Danbury*, 46 N. H. 139; *Upton* v. *Stoddard*, 47 N. H. 167.

V. A town, under our laws, is a corporation created by the legislature. It enjoys and can exercise such powers only as are specifically granted by the legislature. Being creatures of the legislature, the legislature can change, divide, and finally abolish them. By virtue of its powers over them the legislature can relieve them, and also impose burdens upon them. In short, towns are but a part of the machinery of the state government, exercising important functions, which are regulated and controlled by the legislature. *Berlin* v. *Gorham*, 34 N. H. 266; *Bristol* v. *New Chester*, 3 N. H. 534; *State* v. *Canterbury*, 28 N. H. 218; *Londonderry* v. *Derry*, 8 N. H. 320.

The constitution vests the legislature with supreme legislative powers. Art. 2 of the Constitution. To the legislature has also been " given and granted full power and authority *  *  *  to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of and residents within the said state." Art. 5 of the Constitution. The legislature, in 1862, authorized towns to raise and appropriate money to pay bounties, as an encouragement to volunteers to enter the military service. Laws of 1862, c. 2580, s. 3.

In *Crowell* v. *Hopkinton*, 45 N. H. 9, the court gave a construction to this law, but did not question its constitutionality, or the legislative power to pass it. Nor was it questioned in subsequent adjudications under this act, in *Huntress* v. *Stratham*, 46 N. H. 409, and *Stone* v. *Danbury*, 46 N. H. 141. The act of the legislature in 1864 authorized the raising of money to pay bounties to volunteers and drafted men. Laws of 1864, c. 4023, s. 7. *Upton* v. *Stoddard*, 47 N. H. 168, was an adjudication under this act, but neither its constitutionality nor the legislative power was questioned. Neither were these questions raised in *Hilliard* v. *Stewartstown*, 48 N. H. 280, *Kidder* v. *Stewartstown*, 48 N. H. 290, or *Knowlton* v. *Sanbornton*, 48 N. H. 333.

The legislature, in 1864, passed an act authorizing and empowering towns to raise and appropriate money for military purposes; and the operation of one section of that act had the same effect as

the act in question, so far as votes of towns passed previous to its enactment: "Any city or town having, at a meeting duly called for that purpose, and held prior to the passage of this act, voted to pay its soldiers a sum not exceeding the amount herein authorized, is hereby empowered to raise and appropriate the sum voted, in the same manner as if the meeting had not been called or held till after the passage of this act." Laws of 1864, *c.* 4026, *s.* 2. There is no suggestion in any of the decisions that this section was retrospective, or beyond the power of the legislature.

As to the power of the legislature to enact laws of this character, we call attention to *Baldwin* v. *North Branford*, 32 Conn. 47; *Booth* v. *Woodbury*, 32 Conn. 118. These are cases directly in point. The act authorized towns to confirm and ratify votes to pay commutation-money, which were passed before the law. If the legislature can authorize a town to confirm a void vote, it is clear, we submit, that the legislature can itself confirm it.

In *People* v. *Flagg*, 46 N. Y. 401, the court held that the legislature might compel a municipal corporation to make improvements, without the consent of its authorities or a vote of its citizens; also, that it might direct the corporation to levy a tax to pay for such improvement. *State* v. *Tappan*, 29 Wis. 664, has no application to a question like the one here. The law there in question was special, and special laws are inhibited by the constitution of Wisconsin.

VI. When it is within the power of the legislature to grant a corporation authority to do a certain act, if the corporation does it without the authority, the legislature may waive the objection, and ratify and confirm the act by a subsequent statute; and such subsequent ratification gives to the act the same force and validity it would have had if the authority preceded it. *Richards* v. *Railroad*, 44 N. H. 136; *Thomson* v. *Lee County*, 3 Wall. 327; *The People* v. *Mitchell*, 35 N. Y. 551; Pierce on Railroads 511. The legislature of Pennsylvania passed a law which cured fatal defects in the acknowledgments of deeds which were made and executed prior to its passage.

The courts of the United States and Pennsylvania held the law constitutional and within the power of the legislature. *Watson* v. *Mercer*, 8 Pet. 88; *Barnet* v. *Barnet*, 15 Serg. & R. 72; *Tate* v. *Stooltzfoos*, 16 Serg. & R. 35. The legislature of Rhode Island confirmed and ratified an executor's deed, thereby making it good. The court held that it was within the legislature's power to do it. *Leland* v. *Wilkinson*, 10 Pet. 294.

*Carpenter*, for the defendant. Second brief.

It is not pretended that the vote of the town in March, 1864, conferred any right upon the plaintiff, or subjected the town to any liability. It is admitted that the town had no jurisdiction of

the subject-matter, had no power to pass the vote, and that the plaintiff must recover, if at all, solely by virtue of the effect of the statute.

I. I reäffirm the position taken in my first brief, that the act in question, in so far as it undertakes to ratify and confirm the vote or make it binding upon the town, or in so far as it undertakes to compel the town to pay the money to the plaintiff, is void under Article 23 of the Bill of Rights, which forbids the making of retrospective laws.

That this statute has a retrospective operation, that it creates and fixes upon the town of Landaff a new obligation in respect to transactions and considerations already past, is altogether undeniable, and, indeed, is not, as I understand it, questioned; but it is said that this clause of the constitution has no application to public or municipal corporations, "that the prohibitions of the constitution were most manifestly intended to protect private rights only"— *Richardson, C. J.,* in *Dartmouth Coll.* v. *Woodward,* 1 N. H. 120; that "acts of the legislature are not within the prohibitions, unless they operate on the interests of individuals or private corporations"— *Woodbury, J.,* in *Merrill* v. *Sherburne,* 1 N. H. 213; that, in fact, all the powers and rights of municipal corporations are "wholly at the legislative disposal (a doctrine dangerous in government, and, as we think, unsound in constitutional law)." Cooley Taxation 481. Towns can neither be compelled nor authorized to raise by taxation, or to appropriate money, for any except public purposes. *Perry* v. *Keene,* 56 N. H. 514.

Assuming, then, for the purposes of this question, that the money was paid by the plaintiff for such a purpose that the legislature might, by antecedent legislation, have authorized or compelled the town to pay it, I maintain that it cannot by subsequent legislation compel the town to repay it to the plaintiff. That the statute, in so far as it has any effect upon the defendants in this case, is compulsory seems plain, because the town at the time of the vote was by law incapable of having or expressing, in any form, by vote or otherwise, any sentiment or choice upon the subject. *Wilson* v. *School-District,* 44 Conn. 157.

The vote cannot fairly be considered indicative, even, of the personal sentiments of those voting. It must be presumed that the citizens knew the law, and knew therefore that they had no power in the premises, and that any vote they might pass would be utterly void of effect,—in short, that it was a matter of entire and absolute indifference to themselves and to everybody how they voted, or whether they voted at all. But if such was the personal wish of all the voters at the time of the vote, *non constat* that it was so at the time of the passage of this act more than ten years afterwards.

The position in which the town finds itself appears to me very remarkable. If, at the time the vote was taken, the town had had

jurisdiction of the subject-matter,—if the vote had been legal,—it might have been rescinded or reconsidered before actual payment, at any subsequent legal meeting called for that purpose. *Dale* v. *Governor*, 3 Stewart (Ala.) 387. And in that event there would have been no " vote " upon which the statute could operate. A legally rescinded vote would not be a " vote heretofore passed," etc.

But a void vote cannot be reconsidered or rescinded. It was not in the power of the town to make their action any more void, any less effectual, any less a " vote heretofore passed," etc., than it already was. No matter, then, what may have been the sentiment of the town, there was no possible escape from the effect of this statute.

For these reasons it seems clear that the vote is entirely immaterial, except in so far as it serves to identify the towns to which this portion of the statute was intended to apply. The legislature might just as well, so far as giving the citizens of the town any voice in the matter is concerned, have declared that all those towns shall pay, etc., which are less than six miles square, which gave a Republican or Democratic majority at the last election, or all those towns whose names begin with L.

Returning, then, to the question whether the legislature has constitutional power to impose burdens upon towns or municipal corporations by retrospective legislation, I submit,—

1. Towns existed prior to the constitution. They were then and have ever since continued to be corporations, endowed by law with the power of holding and owning property, making contracts, and of suing and being sued in courts of justice, and every dollar's worth of property within their limits, to whomsoever belonging, is directly (and not merely indirectly, by means of taxation) pledged for the performance of their legal obligations. Gen. St., *c.* 220. Why should they not be protected by all the guaranties of the constitution, which in their nature are applicable to them? Was not the constitution ordained for the benefit of all the subjects of the state, artificial as well as natural?

Of course municipal like private corporations, being mere legal entities, without personality, have no occasion for the protection of the person, or of personal rights. The only rights they possess or can possess capable of being invaded are proprietary rights. Those parts of the constitution which relate to personal rights merely, can, from the nature of the case, have no application either to private or public corporations. But why do not its provisions respecting rights of property apply not merely to those of natural persons and private corporations, but as well to those of public corporations, those of every entity within the state, endowed by law with the capacity of holding and owning property for any purpose whatever? There are no express exceptions: upon what ground, upon what sound principle, is one to be implied? Is there

any difference between strictly private rights and property and the property and rights of municipal corporations in this state, except in the purposes for which and to which they may be lawfully exercised and appropriated?

2. It is contended, that inasmuch as the legislature has power to create, change, or abolish towns, it therefore has full and unrestrained power over all their property, and all their rights of property, during their existence as corporations. But (1) the argument proves too much. The legislsture has the same power over strictly private corporations. Gen. St., *c.* 133, *s.* 18. (2) The reasoning is false. It does not follow, because the legislature can at its pleasure make and unmake a municipal corporation, that when created, and during its existence, such corporation has no rights beyond legislative control; nor does the right to abolish include, as being the less, the right to appropriate the effects of the deceased, either before or after dissolution. *Portland* v. *Portland*, 23 Conn. 255–272; *Willimantic* v. *Windham*, 14 Conn. 468, 469; *Bristol* v. *New Chester*, 3 N. H. 535; *Atkins* v. *Randolph*, 31 Vt. 226; *Story, J.,* in *Terrett* v. *Taylor*, 9 Cranch 52 (3 Curt. 256); *Story, J.,* in *College* v. *Woodward*, 4 Wheat. 664 (4 Curt. 505); *Brunswick* v. *Litchfield,* 2 Greenl. 28; *Bowdoinham* v. *Richmond*, 6 Greenl. 112; *Grogan* v. *San Francisco,* 18 Cal. 590; *Windham* v. *Portland*, 4 Mass. 390; *Hampshire* v. *Franklin*, 16 Mass. 76; 1 Dill. Mun. Corp., *ss.* 36–41; Cooley Const. Lim. (4th ed.) 289–295, and notes.

3. It is not necessary to deny that the legislature may impose burdens upon the state by retrospective legislation, and levy taxes for their discharge. The restrictions of the constitution are directed against the power of the state over its subjects, not over itself. However that may be, this particular clause, by express terms, excludes any idea of its application in such case. There can be no " civil cause " against the state. The tax itself can never be the subject of a civil action. The town could not have a " civil cause " for the recovery of the taxes, nor could any suit be brought against them, so far as I know, on account of the taxes; and for this reason the act is, *quoad* the town, unobjectionable. *Richardson, C. J.,* in *Bristol* v. *New Chester*, 3 N. H. 534; *Hibbard* v. *Clark*, 56 N. H. 155.

4. None of the very numerous cases, sustaining retrospective legislation in those jurisdictions where there is no constitutional prohibition, need be examined or questioned here. " There is no doubt of the right of the legislature to pass statutes which reach back to and change or modify the effect of prior transactions, provided retrospective laws are not forbidden, *eo nomine*, by the state constitution." Cooley Const. Lim. (4th ed.) 461. The great importance of knowing and keeping in mind the constitutional provisions of the several states when examining the decisions of their courts upon this question, and the grave liability of falling into error unless one does so, are clearly shown by *Bellows, J.,* dissenting, in *Rich* v. *Flanders*, 39 N. H. 386–391.

5. In *New Orleans* v. *Clark*, 95 U. S. 644, *Field, J.*, who delivered the opinion, fell into the error of treating judicial decisions in jurisdictions where retrospective legislation is not prohibited, as apposite and authoritative in those where it is. To say that " a law requiring a municipal corporation to pay a demand (preëxisting, of course) which is without legal obligation, but which is equitable and just in itself, being founded on a valuable consideration received by the corporation, is not a retroactive law," is, I submit, sheer and utter nonsense. What has the justice or injustice of the demand to do with the question whether the law is retroactive or not? If Judge Field means to say that only such retroactive laws as may happen in the opinion of the court to work injustice and oppression are forbidden, then I want to know where in the constitution of Louisiana he finds that limitation?

In many of those states where retrospective legislation is not expressly prohibited, laws of that character, which appear to the courts to be repugnant to the principles of natural justice, have been for that reason held invalid; but acts of that character, which appear to the court just and reasonable, are upheld. Rights are not regarded as " vested contrary to the equity of the case." Cooley Const. Lim. 460–479, and cases above cited. But in this state the question does not turn upon the " substantial equity " (53 N. H. 580) of the particular case. The constitution prohibits not merely such retrospective laws as may happen to appear to the court " injurious and oppressive," but all such laws " for the decision of civil causes," whatever their end or particular effect may be. Whether, therefore, there was " any executed contract, any consideration or benefit received by the defendant, or any change of plaintiff's position, on which justice upholds the retrospective. character of the statute," is entirely immaterial.

6. The provision of the constitution of the United States, that no state shall pass any law impairing the obligation of contracts, was early held to protect not merely individuals, but all municipal as well as other corporations,—in short, every entity within the United States endowed by law with the capacity to make a contract. *Fletcher* v. *Peck*, 6 Cranch 87; *Green* v. *Biddle*, 8 Wheat. 1–92. The reasoning used in those cases is equally applicable here.

In *Spaulding* v. *Andover*, 54 N. H. 38, it was held that this clause is applicable to contracts between the state and municipal corporations. Why should a different construction be given to the clause under consideration in our own constitution, from that put upon the federal constitution? The language is equally general in each. Upon what ground, upon what sound principle of construction, is it to be held that the " civil causes " of towns are not protected by our own constitution against retrospective legislation, while their contracts are protected by the federal constitution against impairment?

8. The holding of our own court has been uniform, that munici-

pal corporations are as entirely within the protection of the consti-
tution as are natural persons.   To this point the following cases
were cited and commented on : *Richardson, C. J.*, in *Bristol* v.
*New Chester*, 3 N. H. 524 ; *Londonderry* v. *Derry*, 8 N. H. 320 ;
*Dunbarton* v. *Franklin*, 19 N. H. 257 ; *Kennett's Petition*, 24 N. H.
139 ; *Pembroke* v. *Epsom*, 44 N. H. 113.

Towns are under the protection of Art. 15 of the Bill of Rights,
and cannot " be held to answer for any offence, until the same is
fully and plainly, substantially and formally, described." *State* v.
*Canterbury*, 28 N. H. 195, 228.   Under Art. 20 the right of trial
by jury is secured to them.   *Copp* v. *Henniker*, 55 N. H. 179.

Suppose that a Mr. Jones erected at his own expense a bridge
over the Connecticut river at Bath, and maintained the same for
many years to the great benefit of the public generally, and of the
citizens of Bath especially, until it was carried away by the last
freshet : can now the legislature compel the town of Bath to refund
to Mr. Jones the cost, or any part of the cost, of his bridge ?

Suppose a father, not of " sufficient ability," has nevertheless, in
fact, supported his pauper son for many years : can the legislature
compel the town in which the pauper has his settlement to repay
the father for such support?   How is this case to be distinguished
from the one at bar, assuming that the town, as such, is bound
to fill its quota?   The subject-matter in each case is equally one
of public concern, and the town is equally benefited in each case,
equally relieved from a public burden.

If the legislature cannot take away from a town a vested right
of action (*Pembroke* v. *Epsom*, above cited), how can it take away
a vested right of defence ?—how can it make that a legal claim
which before was not?   Could it make the bond given by Bos-
cawen to Canterbury, which in a suit thereon between those
towns (17 N. H. 465) was held void by the court, a valid bond,
legally obligatory upon the defendant town?—or Epping liable to
Gove (41 N. H. 539) for costs of the criminal prosecution against
him ?   If it could, could it do so as well after (1 N. H. 213; 10
N. H. 380) as before judgments rendered in said suits?   If it
could not, then clearly it could not remove the bar of the stat-
ute of limitations; and (provided the statute in question is sus-
tainable) the case presents this notable feature, that the town, by
attempting what it had no power to do, by its void action is put in
a worse condition than it would have been had it possessed full
power, and its action been legal and valid ; for in that case the
plaintiff's claim would have been barred by the statute long before
the passage of this act.

II.  Upon a just and reasonable construction of this statute, upon
such a construction as the legislature intended, the plaintiff's claim
is barred by the statute of limitations.

III.  The legislature could not under the constitution, by ante-
cedent legislation, authorize towns to pay commutation-money in

order to relieve their citizens from the draft, because the purpose for which the money was to be paid was not a public one.

One's property can be taken under neither the power of eminent domain, nor that of taxation, for any purpose except for public uses, in the strict sense of the term,—that is to say, for the use of the public,—so that the whole public in fact have, or are legally entitled to have, the direct and immediate benefit and enjoyment of the appropriation, whether it be of property or of money; and for whatever use one's property may be condemned, his estate may be taxed, and for no other, and *vice versa.* All attempts to draw any sound distinction between these two powers, so far as relates to the purposes for which they may be exercised, have signally failed. Accordingly, as was to be expected, we find the court which first upheld the "Mill acts," so-called, when at length confronted with the question whether taxes may be levied for the same or similar purposes, very sensibly and wisely denying that those acts can be sustained as an exercise of the power of eminent domain, but claiming, with a fatuity not expected, that they may be supported upon other grounds certainly no better: if they are no worse, it is only because they could not be. *Lowell* v. *Boston*, 111 Mass. 454.

To distinguish between a strictly public and a private use may not in every case be altogether easy. The general distinction taken by the cases, and, though often difficult of application, the only one which the nature of the question seems to admit, is between the direct, primary, and immediate, and the remote, indirect, consequential, or incidental, effects of the particular use in question. In other words, the character of any given use is in' general determined by its primary and direct object or effect, without regard to incidental results. *Wells, J.*, in *Lowell* v. *Boston*, 111 Mass. 461, 462; *Opinions of Judges, Dickerson, J.*, especially in 58 Me. 590; *Miller, J.*, in *Association* v. *Topeka*, 20 Wall. 664; *Curtis* v. *Whipple*, 24 Wis. 353, 354; *Folger, J.*, in *Weismer* v. *Douglas*, 64 N. Y. 100, 101; *Allen* v. *Jay*, 60 Me. 124; *Bank* v. *Iola*, 2 Dill. 353; *Tyson* v. *Directors*, 51 Pa. St. 9; *Tyler* v. *Beacher*, 44 Vt. 648; *Cooley, J.*, in *People* v. *Salem*, 20 Mich. 488; *Christiancy, J.*, in *People* v. *Salem*, 20 Mich. 500; *Bigelow, C. J.*, in *Freeland* v. *Hastings*, 10 Allen 589.

It is a mistake that towns, as such, in their corporate capacity, were under obligation to fill the quotas assigned to them: and this fallacy underlies the whole of the plaintiff's argument. The language used by courts in some cases (for the most part, but not always, *alio intuitu*) lends perhaps some color to the idea, but it is plainly without foundation. The following cases—*Butler* v. *Putney*, 43 Vt. 484; *Seymour* v. *Marlboro*, 40 Vt. 178; *Taylor* v. *Thompson*, 42 Ill. 16; and especially *Wilson, J.*, in *Laughton* v. *Putney*, 43 Vt. 493–497—afford good examples of the general patriotic looseness of language used by courts on this point.

Congress has no power to impose the duty of furnishing men for

military service either upon any state, or upon any corporate sub-division of a state.  Constitution, Art. I, s. 8; *Houston* v. *Moore*, 5 Wheat. 1; *Martin* v. *Mott*, 12 Wheat. 19.  It cannot even im-pose a tax upon a state municipal corporation.  *Collector* v. *Day*, 11 Wall. 113.

Moreover, towns had no power to perform such a work.  That congress cannot impose duties upon a municipal corporation cre-ated by the state, possessed of no powers except such as it has con-ferred, and liable to dissolution at any minute, which that corpora-tion has by law no power to perform, seems tolerably clear without discussion.  But however that may be, congress did not undertake to do so.  The first law passed by congress during the late war, for the purpose of filling up the army otherwise than by volunteers, was the act of March 3, 1863, which provides that "For the greater convenience" of enrolling, etc., the United States shall be divided into districts, of which each congressional district shall constitute one, and that the board of enrolment may divide each district into sub-districts; that the president may assign to each district the number of men to be furnished by said district, and in doing so shall take into consideration the number of volunteers fur-nished by and from the several states in which said districts are situated, and the period of their service, so as to equalize the num-bers to be furnished among the several states.  Under this law the plaintiff was drafted, and paid $300 to obtain his release, in accord-ance with the provisions of s. 13.

The act of February 24, 1864, in amendment of the foregoing, provides "that the quota of each ward of a city, town, township precinct, or election district, etc., shall be as nearly as possible in proportion to the number of men resident therein liable to military service, taking into account as far as practicable the number which has been previously furnished therefrom."  Obviously congress makes use of the various civil divisions of the several states as a pure matter of convenience only, and entirely without regard to the fact whether such divisions are endowed with corporate powers of any kind or not.  It might, in fact it did, create districts entirely independent of town or county lines, or of any other existing lines, and assign quotas thereto.  The acts operate, and purport by their express terms to operate, only upon the individuals of the districts liable to render military service,—the enrolled men,—providing that out of the number resident in a district a proportionate number shall be drafted into the service.  See *Lyon, J.,* in *State* v. *Tappan*, 29 Wis. 673.

The legal obligation to fill the quota assigned to Landaff rested therefore solely and exclusively upon a particular class, namely, the men liable to render military service, and resident therein.  In the filling of that quota no other citizen of the town had the remot-est legal interest or concern.  It may indeed be said that it was a matter of vital interest to all the citizens that those who were under

that legal obligation should perform it.   But it may be pertinently asked, Upon what sound principle of public policy, even, can be justified the appropriation of the public moneys to " encourage" a class of men to perform an obligation imposed upon them by law?

But until the draft was actually made, the legal obligation of each individual of the enrolled men to enter the service was not fixed and absolute, but inchoate, uncertain, and contingent; and inasmuch as the general duty of national defence rests upon all citizens alike, and not merely upon any one class, and no more upon enrolled men than upon anybody else until actually drafted, it may perhaps with some slight color of reason be held, as it has been in numerous cases, that towns may be authorized to encourage enlistments, and to pay bounties to volunteers for that purpose, the direct object and primary effect being to aid in the discharge of a burden common to all, although it may have the incidental effect also of relieving a particular class of persons from a legal liability. It happens to benefit a class of men more than it does others, as every public measure from the nature of things must.

This question has apparently never received any consideration at the hands of this court, although numerous suits against towns for bounties have come before it.   In *Crowell* v. *Hopkinton*, 45 N. H. 9, the first reported case on the subject, the question of the constitutionality of the law authorizing bounties was not raised; but *Bell, J.*, says "It forms no part of the ordinary duties of towns to encourage the enlistment of soldiers, by bounties or otherwise. They may be specially authorized by statute, perhaps, to raise money by tax or loan, and to apply it to such purposes, or they may be required to perform duties of that kind;" and the opinion contains not another word on the subject.

In *Shackford* v. *Newington*, 46 N. H. 415, the position was for the first time taken that the law was in violation of the constitution.   The court, *Bellows, J.*, at the close of the opinion, disposes of the objection in these words: " It is urged that the legislature had no power under the constitution to authorize towns to raise money to pay bounties to volunteers: but in the case of *Crowell* v. *Hopkinton* (45 N. H. 9), before cited, it was held that such a vote by a town was valid; and we are satisfied with that opinion."   In all the other cases the question is passed *sub silentio*, without the remotest allusion to it.

Laws authorizing the payment of bounties to drafted men, who either enter the service themselves or procure substitutes, stand in some respects upon the same footing as those authorizing bounties to volunteers,—both tending alike to fill up the army, and promote the national defence.   But the act in question has in its favor not even the feeble apology which exists in behalf of the bounty laws. Manifestly the payment by towns of commutation-money, so far from encouraging enlistments would have a direct tendency to discourage them.   One strong inducement to volunteer arose from the

liability to be drafted, and thus being compelled to serve without any bounty. The idea advanced by the plaintiff, that commutation-money was received by government as the equivalent for a substitute, is entirely groundless. "So far from being equivalent to personal service, the payment of the money was imposed as a fine for not rendering such service." *Dickerson, J.*, in *Thompson* v. *Pittston*, 59 Me. 554. It would tend also to prevent drafted men themselves from entering the service, and the act would therefore be "void as obstructing the general government in performing its functions, and as tending to defeat the operation of the act of congress of March 3, 1863;" and so it was held in *State* v. *Jackson*, 33 N. J. 450.

[Special attention was called to the reasoning of the court in the last case; also to the language of the court in *Thompson* v. *Pittston*, 59 Me. 545, *Kelly* v. *Marshall*, 69 Pa. St. 319, and *Freeland* v. *Hastings*, 10 Allen 589.]

By the draft, the obligation of the drafted man becomes fixed and absolute: payment of the commutation-money by the town has the effect to release him entirely from that obligation. Now, whether towns can be authorized to pay bounties in order to stimulate men to perform duties imposed upon them by law or not, I insist that they cannot be permitted to appropriate money for the purpose of releasing a man from a duty which is by law incumbent and fixed upon him; and it makes no difference whether that duty be to pay money or to do something else, or whether the money to be paid or the act to be done will or will not promote the general good, and be of public benefit. Admitting that it is for the public benefit that a drafted man should pay his $300 to the government, it does not therefore follow that it is for the public good that the public should pay it for him.

Assuming even that it were incumbent upon towns in their corporate capacity to fill their quotas, the payment of the commutation-money for a drafted man does not benefit them in the remotest degree. What difference can it possibly make to the town whether it is paid or not? If not paid, the man enters the service; if it is paid, he escapes;—but the quota—the number of men to be furnished by the town—remains the same in either case.

Finally, I submit that nobody is benefited by the payment of this money except the man who pays it. If towns can be authorized to pay it, they can be authorized to pay any and every other claim which government may have. If not, why not? Why not the bond of a defaulting post-master? Why may they not be authorized to pay all the income tax assessed upon their inhabitants? A, who was assessed $300 as an income tax, was under no more obligation to pay it than was this plaintiff, being drafted, to pay his $300, or enter the service, or procure a substitute; and so far as the public is concerned, the payment in each case had precisely the same effect. Neither the town as such, nor the enrolled

men therein, derived any other or further advantage from the $300 paid by this plaintiff, than did all towns and all citizens within the United States,—exactly the same, namely, as they all received by reason of the payment by A of his income tax.

Such a law is in violation of those provisions of the constitution which require that all taxation shall be equal. *Opinion of Justices*, 4 N. H. 565.

As already shown, money paid as commutation is of no special local benefit. The town which pays it and its citizens receive no more advantage, directly or indirectly, than an adjoining town which does not pay it and its citizens.

A tax, in the benefits and advantages of which all the people throughout the entire state equally participate, in order to be equal, must be assessed equally upon all the persons and estates within the state. It will not probably be contended that the legislature could compel one or more towns to pay the whole state debt, or to build the new state prison. Can it any more authorize towns to contribute towards the payment of the debt, or the building of the prison, as a majority of the legal voters therein may see fit? If the town of Landaff, by a bare majority, votes to pay the whole debt, must the minority submit? How can the legislature confer upon such majority a power which it does not itself possess? If the vote were unanimous, the case might be different—*volenti non fit injuria*. *Cypress Pond Co.* v. *Hooper*, 2 Met. (Ky.) 350; *Ferguson* v. *Landram*, 1 Bush. (Ky.) 565. The question is, whether those who dissent can be compelled to pay a tax of this nature, which all the citizens of all other towns are permitted to escape. The guaranties of the constitution are provided for the safety and protection of minorities: majorities do not need them.

The authorities in support of this argument are numerous. Cooley Taxation 104, *et seq.*; Cooley Const. Lim. 613–617; *Ferguson* v. *Landram*, 1 Bush. (Ky.) 548; *Merrick* v. *Amherst*, 12 Allen 504; *Dorgan* v. *Boston*, 12 Allen 235–238; *Oliver* v. *Washington Mills*, 11 Allen 275. [The following authorities were quoted from at considerable length: *Cooley, C. J.*, in *Ryerson* v. *Utley*, 16 Mich. 276; *Black, C. J.*, in *Sharpless* v. *Philadelphia*, 21 Pa. St. 168, 171; *Sharswood, J.*, in *Hammett* v. *Philadelphia*, 65 Pa. St. 151, 153; *Seely* v. *Pittsburgh*, 82 Pa. St. 367, 368.] See, also, *Wagner, J.*, in *McCormack* v. *Patchin*, 53 Mo. 36; *State* v. *Haben*, 22 Wis. 660; *People* v. *Salem*, 20 Mich. 452; *Bank* v. *Hines*, 3 Ohio N. S. 15; *Sanborn* v. *Rice Co.*, 9 Minn. 273; 2 Kent Com. 331, 332.

IV. If the legislature can authorize the payment of commutation-money in the case of future drafts, it cannot authorize a refunding of such moneys paid by individuals in the past for the purpose of procuring their discharge, and without any expectation or promise of reimbursement, because "such repayment by the public could be nothing else than an appropriation of public moneys to a private purpose." Cooley Taxation 101.

V. But if towns may be authorized to refund such moneys, they cannot be compelled to do so. [This point was fully argued, and the following authorities cited: Cooley Const. Lim. 284, and cases in note; Cooley Taxation 474–495, and cases cited; *Tyson* v. *Directors*, 51 Pa. St. 22; *Grim* v. *Weissenberg*, 57 Pa. St. 433; *Perkins* v. *Milford*, 59 Me. 315; *Thompson* v. *Pittston*, 59 Me. 545; *Kelly* v. *Marshall*, 69 Pa. St. 319; *Ferguson* v. *Landram*, 1 Bush. (Ky.) 548—*S. C.*, 5 Bush. 230; *People* v. *Detroit*, 28 Mich. 228; *State* v. *Tappan*, 29 Wis. 664; *Freeland* v. *Hastings*, 10 Allen 570; *Booth* v. *Woodbury*, 32 Conn. 118; *Waldo* v. *Portland*, 33 Conn. 363; *State* v. *Jackson*, 33 N. J., 450.]

VI. But even if all towns throughout the state may, by a general law, be compelled to refund such moneys, one or more towns cannot be singled out and compelled to do so while all others are left to do as they please.

1. It is emphatically class legislation,—selecting particular individuals from a class or locality, and subjecting them to peculiar rules, or imposing upon them special obligations or burdens, from which others in the same class or locality are exempt. Cooley Const. Lim. 490, *et seq.*, and notes and cases cited. It is not a "general law in relation to a particular place." The objection here is, not that the law "does not extend to all places," but that it "does not extend to all persons" of the same class. *Scott* v. *Willson*, 3 N. H. 321; *Opinion of Justices*, 4 N. H. 572–574.

2. It makes taxation unequal. All which has been hereinbefore urged upon this subject is with even greater force applicable here. This court has held that the legislature cannot constitutionally grant a tax upon a particular town, for the purpose even of making or repairing highways therein. *Opinion of Justices*, 4 N. H. 565.

VII. Upon the supposition that the statute is not in conflict with the constitution, I submit that the effect of the vote, assuming it to be valid, either in the first instance or made so by the statute, was not to subject the town to any liability, but simply to impose a legal obligation upon the selectmen.

1. It is not pretended that the town owed the plaintiff anything, or was under any obligation to him whatever before the vote was taken. We have none of the elements of a contract. The consideration, if any, was past and executed. If the plaintiff had rendered any service to the town, it was done long before the vote, of his own motion, and not at the request of the town. Whatever liability, then, rests upon the defendants arises solely from the vote. But (1) the vote does not purport to subject the town to any liability. It simply instructs the selectmen to pay the plaintiff $300. (2) A vote of a town, instructing their officers to pay what they are under no obligation to pay, manifestly cannot convert the proffered bounty of the corporation into a subsisting debt against it. Clearly, until payment is actually made, the instructions may be re-

voked. *Dale* v. *Governor*, 3 Stewart (Ala.) 387; *Terrett* v. *Sharon*, 34 Conn. 105–108; *Paine* v. *Boston*, 124 Mass. 486. But even if that be not so, if by the vote the duty of the selectmen to pay is irrevocably fixed, how can their neglect or refusal to perform that duty give to the object of the town's bounty a cause of action against the corporation?

2. The statute, by "ratifying, confirming, and making legal and binding" votes previously taken, cannot certainly be construed as giving to such votes any greater force or obligation than to votes subsequently passed under the authority conferred by the same statute. But a subsequent vote to refund the money would impose no legal obligation upon the town to do so. *Cole* v. *Bedford*, 97 Mass. 326, note. Both of these cases go upon the simple ground that a vote of a town, under due authority conferred by statute, to refund to individuals moneys paid by them under such circumstances, does not confer upon them any right of action against the corporation. In other words, such a vote, assuming it to be a promise, has no greater effect than the promise of a natural person to make a present to his neighbor. *Usher* v. *Colchester*, 33 Conn. 567, is (so far as respects this particular point) identical with this case. *Terrett* v. *Sharon*, 34 Conn. 105, goes to precisely the same point, although there was in that case a vote of rescission. See, also, *Paine* v. *Boston*, above cited.

VIII. The plaintiff has mistaken his remedy, if he has any. If any action at law would lie against the defendants, it must, upon general principles, be debt and not assumpsit. But the liability of the town, as well as that of their officers by reason of it, is still to be measured by the terms of the vote itself; and, as already argued, the most that can be said is, that, by means of the vote and of the statute confirming it, the legal duty of the selectmen to pay this plaintiff $300 became and was irrevocably fixed and absolute. If the selectmen neglect or refuse to perform that duty, they may be punished by indictment. Gen. St., *c.* 244, *s.* 20; *State* v. *Hoit*, 23 N. H. 355. The remedy to compel the performance of that duty is by mandamus, and that is the only remedy open to this plaintiff. *Hall* v. *Somersworth*, 39 N. H. 511, and cases cited; *Treat* v. *Middletown*, 8 Conn. 243–246; 2 Dill. Mun. Corp., *c.* 20, *ss.* 662–671, 685–693; *Kidder* v. *Stewartstown*, 48 N. H. 290.

*Bingham & Mitchell*, for the plaintiff. Second brief.

Was the purpose for which this money was paid by the plaintiff such a one as the law recognizes as a public purpose?

The direct benefit resulting from its payment enured to the public. The mission of the government being to govern and protect the public, the burden of its support and preservation devolves upon the public. The theory of our republican institutions is, that equality in protection is afforded all persons and property,—in return

for which, support and defence are required of all persons and their property upon a like basis of equality. No one person or class of persons can be abitrarily required and compelled to assume the entire burden of the support and defence of the government, or an unequal share of that burden. If, from a lack of previous provision, the public necessity demands that a particular class of persons shall for the time being assume an unequal share of the public burden, when the exigency which demanded it has passed it is due from the public to reimburse that class of persons and thereby equalize the burden.

Upon whom devolved the duty of filling the quotas of the several towns? Was it the duty and legal obligation of the men who were either drafted or liable to a draft, or was it the duty of the several towns in their corporate capacity? We maintain that it was the duty of each town to fill or provide means for filling their quota of men, and not the duty of the citizens of that town who were liable to draft.

The public defence required men, and the president called for them. The law designated the number of men required of each town to fill the number called for by the president, and not the sacrifice required of each man, or of a particular class of men, to answer that demand.

The history of every town in the state, during the war, attests the fact that the duty and burden of filling their quota of men was by them regarded as a public duty and burden, and their votes and acts were shaped in accordance with that understanding, and aimed at the performance of that duty. When a call was made, and the number required of each town was ascertained, they met in public meeting, in their corporate capacity, and, under the power granted them by the legislature, they raised and appropriated money to be offered and paid to men as an inducement to enlist and have their enlistment credited on the town's quota. Agents were employed at the town's expense to procure these enlistments. The laws which authorized towns to raise and appropriate money for filling their quotas, have, by numerous well considered adjudications, in this and other jurisdictions, been held constitutional. These laws have been held constitutional, upon the ground that the purpose for which the money was raised and appropriated was a public one. The purpose was to fill the town's quota: hence the duty and burden of filling the quota was a public duty and burden. Since to fill the quota was a public duty, a failure to perform it was a public and not an individual failure: so the loss consequent upon that failure should be borne by the public, who are the party in default.

The duty of filling the quota was an entirety. If the public were under the obligation of filling any portion of it, they were obliged to fill it entire. If it was lawful and constitutional for the public to fill a portion of the quota, it was clearly lawful and con-

stitutional for them to supply it entire. In other words, if filling a portion of a town's quota was a public purpose, it follows that to fill the quota entire was a public purpose. And if it was the duty of the public to fill the quota, a loss sustained by an individual in consequence of the public failure to perform their duty is a very proper matter for the public to reimburse and repay to that individual.

As we view it, there can be no doubt but that it was incumbent upon this defendant town to furnish, for the public defence, the number of men fixed by the law as their quota.

The demand for men was made upon the towns in their public capacity, and not upon a few individual citizens of the town. Had this town done their duty by filling their quota, no draft would have been necessary, and consequently no loss sustained by this plaintiff by reason of a draft. The draft necessitated the payment of this money by the plaintiff. The defendants' failure to perform their duty necessitated the draft, consequently the primary cause which compelled the plaintiff to pay this money was the defendants' failure to perform a plain legal duty. In addition to this the payment of the money was credited, not to the plaintiff, but to the defendant town, as one man, and reduced the government's demand against them to that extent. And the money was applied to the increase of the public defence.

It is said that the plaintiff paid this money simply in discharge of an individual obligation he owed to the government. This we deny. If it was an individual obligation he owed, then it was a tax: but it was not a tax, because it lacked the essential element of equality. When and why was a draft required? The number of men for each town was designated. The time within which they could furnish them was fixed. The public safety required the number of men designated by the time fixed; and the law, anticipating the possibility of a failure on the part of towns or districts to perform this duty in furnishing their required numbers by the day fixed, provided an arbitrary manner of getting the deficiency by making a chance selection from the soldier material in the town. This was resorted to upon the town's failure to fill their quota. This method was not resorted to because the individual drafted owed military service to the government, but because the town, of which he was a citizen, were indebted to the government for men, and the necessities of the government were such that it must have the men; and it leaves the town and their citizens, who fell victims from the town's negligence, to settle the matter among themselves. And the law in its wise provisions gave to the towns power to settle with and compensate their citizens for the loss and unequal burden they were compelled to assume in consequence of the town's failure, resulting either from negligence or inability.

In illustration of our view, suppose that the protection of the government required one hundred thousand horses to be used in

its defence, and, instead of buying them with the revenue of the government, the president made a call upon the country for them, and each town were required to furnish, on or before a fixed day, their proportionate number of these horses. These horses would be an assessment upon the town. If the town raise money, buy, and furnish them, it is all right. But, as in the case of men, the law, anticipating a possible failure of the town, provides that in case of such failure the officers of the government will go to the town in default, and take indiscriminately and arbitrarily from among the serviceable horses they find therein the number the town are in arrears. Can there be any doubt but that the horses thus taken arbitrarily are as much for the public use and benefit as the horses furnished by the town with the money by them raised? Is there any doubt about the constitutionality of an act of the legislature which authorizes the town to pay the persons from whom the horses were thus taken the value of them? We submit there is not. If a person has an execution against a town which has no property to satisfy it, after a notice required by the statute, and the expiration of sixty days, he may levy his execution on the property of the selectmen, if they have sufficient to satisfy it; otherwise, upon the property of any inhabitant of the town. The inhabitant whose property has been thus taken to satisfy the execution is entitled to recover the sum so levied, and damages and double costs. Gen. St., c. 220, ss. 8, 10.

The inhabitant's property is taken upon the town's failure to pay their debt. The citizen is entitled to recover the amount by him paid, because the burden put upon him is unequal, and should be shared by the other inhabitants of the town. We contend that the same principle which governs the rights of a creditor, inhabitant, and the town, under this statute, governs the rights of the government, citizen, and town in the case of a draft,—the citizen in the one case standing in the same relations to the town that the inhabitant does in the other, and the government and creditor standing alike.

The votes of towns raising and appropriating money to fill their quotas, the acts of legislatures authorizing or ratifying such votes, and the adjudications and course of reasoning adopted by the courts when determining judicially the validity of such votes and acts, all directly support us in our position, that the duty of filling a town's quota was a public duty, devolving upon the town, and the burden of it must be borne by the town. In *Hickok* v. *Shelburne*, 41 Vt. 415, the court say, "It has been repeatedly held that the obligation upon the town was perfect and complete, upon the call of the president for men and assignments of its quota under the law, to furnish them." It being the defendant town's duty to fill their quota, their failure, and the plaintiff's consequent draft, which required the payment of $300, entitle the plaintiff to a repayment of this money, the law having authorized the town to repay it.

Acts authorizing towns to pay bounties have been held constitutional and within the legislative power so often, and by so large a number of courts, in thoroughly considered decisions, that no one at this time questions it. The reason invariably assigned for holding these acts constitutional is, that the money authorized was appropriated for a public purpose. The correctness of this position, that the money was for a public purpose, no one doubts.

If the law authorizing the repayment of commutation-money is constitutional, that which authorizes the repayment of money paid by a drafted man for a substitute is also constitutional, and *vice versa*. The one puts in his own substitute, while the other pays money which presumptively the government has used to procure a substitute for him. Our position is, not only that commutation-money and money paid for a substitute are alike, and governed by the same principle, but that money paid as bounties is also paid for the same purpose, as affects the public, and is governed by the same principle. In principle there is no difference, and there can be no difference. The public welfare is promoted equally in each instance. The public good demands it in each instance. The same substantial object is accomplished in each case, viz., the quota is filled, the public forces are increased, and the public security assured. If money paid as bounties is for a public purpose, then we contend it is clear that money paid by individuals in instances where the town failed to get men for bounties is equally as much for a public purpose. The name, whether it be bounty, commutation, or substitute, under which the money was paid, amounts to but little : it is the object for which it was paid that should govern.

Let us examine the two cases, and see if in principle they do not run together. Bounties are constitutional and authorized, it is said, because " the whole community have shared in the benefits accruing from the payments."

The draft could directly affect but one class of the citizens. It could not reach the whole public, because liability to draft was limited to a class. This legislation, then, it is claimed, had for its object the relief of this class of persons from the sacrifices consequent upon a draft. If the legislature has power to authorize a taxation which will prevent the burdens incident to conscription, can it not, by the exercise of the same power, authorize a taxation which will relieve the class of persons who have fallen victims to the rigor of the conscription laws ? In principle, can there be any possible difference between a town's giving A $300 to enlist to save B's being drafted, and giving $300 to B to pay his commutation-money, he having been drafted? Can it be said, with any show of reason, that the public share in the benefits of a law which pays A a bounty to enlist and save the draft of B, any more than they do in a law which authorizes the payment of B's commutation-money when he is drafted ? In each instance B is the man saved. He is as completely saved in the one as he is in the other instance.

Each law has the same thing in view, and the effect of each accomplishes the same result.   The public interest is as practically and effectually subserved in the one case as in the other.   If it is for a private purpose in the one case, it is in the other.   If to serve upon being drafted, or commute it with money, is a duty private and personal, and in which the public have no concern, then we maintain that the liability to be drafted, which the town in a large number of cases removed by paying bounty, is equally so.   And if, on the other hand, a liability to draft is a liability thrust upon him for the public, and for which the public can pay to relieve him, then we claim a draft thrust upon him is for the public, and the power which authorized the public to remove the liability will also authorize them to relieve him from the draft, which was the direct result of the liability they failed to remove.

It seems too clear for argument that a power which can remove a liability can also remove the consequence of that liability.   And if it is a public duty or purpose to remove a liability to draft, it is equally a public duty to remove the burden imposed by the draft, consequent upon a failure to remove the liability.   The true reason why bounty money is regarded as paid for a public purpose, is because it is paid towards filling the town's quota of men, which is a public duty and burden upon the town.   And it being the town's duty to fill its quota, the $300 commutation-money, which counts one man for the town, and is part of its quota, is paid for a public purpose, as well as $300 bounty paid to a volunteer whose enlistment is credited to the town, as the drafted man's commutation is, and counts the same, and no more.   A volunteer, substitute, and $300 commutation-money stood alike in the reduction of the town's quota.   In each instance the public got the same.   In case of volunteer and substitute, men were actually put in; and in case of the commutation, a man was presumptively put in by the government.   At all events, the government gave the town the same credit; and there is no tangible reason, legally or morally, why, for the same benefits, the town should not pay the same price.

These views and positions are fully sustained by the best considered decisions, which involved and settled this particular question here presented.   As cases in which was raised and adjudicated this exact question, and which are directly in point, we ask particular attention to the following: *Booth* v. *Woodbury*, 32 Conn. 118; *Baldwin* v. *North Branford*, 32 Conn. 47 ; *Waldo* v. *Portland*, 33 Conn. 363; *Bartholomew* v. *Town of Harwinton*, 33 Conn. 408; *Usher* v. *Colchester*, 33 Conn. 567 ; *Laughton* v. *Town of Putney*, 43 Vt. 485; *Comer* v. *Folsom*, 13 Minn. 219; *Wilson* v. *Buckman*, 13 Minn. 441; *Miller* v. *Putnam County*, 29 Ind. 75; *Dean* v. *Putnam County*, 29 Ind. 117; *People* v. *Westford*, 38 How. Pr. 23 ; *People* v. *Westford*, 53 Barb. 555.

[These cases were then commented upon separately.]

In conflict with these authorities and our positions, we have been able to find but two cases, viz., *Kelly* v. *Marshall*, 69 Pa. St. 319, and *Freeland* v. *Hastings*, 10 Allen 570.

In *Kelly* v. *Marshall* the question was raised and decided;—but an examination of the case will show that the subject was but little considered, and is entitled to but little weight compared with the cases above cited, where there was a full investigation and thorough consideration. In *Freeland* v. *Hastings* this question was not raised, because the statute under consideration did not cover it. All the court said touching it was uncalled for: it was considering the constitutionality of a law which did not exist.

The legislature, by the act of 1874, decided that money paid for substitutes and commutation was money paid for that which constituted a public burden, and was for a public purpose. The legislature has power to authorize towns to raise and appropriate money for any public purpose. The legislature has not only the power to grant the authority, but it is also vested with the power to judge of what is a public purpose and for the public good.

In Cooley Con. Lim. 129, it is said, "what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which cannot be controlled by the courts, except, perhaps, when its action is clearly evasive. * * * Certain expenditures are not only absolutely necessary to the continued existence of the government, but, as a matter of policy, it may sometimes be proper and wise to assume other burdens which rest entirely on considerations of honor, gratitude, or charity. * * * There will therefore be necessary expenditures, and expenditures which rest upon considerations of policy alone; and in regard to the one as much as to the other, the decision of that department to which alone questions of state policy are addressed must be accepted as conclusive." Cooley Con. Lim. 488.

In *Booth* v. *Woodbury*, 32 Conn. 128, it is said by the court, "If there be the least possibility that making the gift will be promotive in any degree of the public welfare, it becomes a question of policy, and not of natural justice, and the determination of the legislature is conclusive. And such is this case. Such gifts to unfortunate classes of society, as the indigent blind, the deaf and dumb, or the insane, or grants to particular colleges or schools, or grants of pensions, swords, or other mementos for past services, involving the general good indirectly and in slight degree, are frequently made, and never questioned."

To the same effect is *Speer* v. *School Directors of Blairsville*, 50 Pa. St. 150, in which it is said that "a tax law must be considered valid unless it be for a purpose in which the community taxed has palpably no interest, when it is apparent that a burden is imposed for the benefit of others, and when it would be so pronounced at first blush."

This question was ably and elaborately discussed by Judge Ladd in delivering the opinion of the court in *Perry* v. *Keene*, 56 N. H. 514, decided by the superior court of New Hampshire, and published in 15 A. M. Law. Reg (N. S.) 397. Judge Ladd said, p. 534, " But before the court can reverse the judgment of the legislature and the executive, and declare a statute levying or authorizing a tax to be inoperative and void, a very clear case must be shown. After the legislature and the executive have both decided that the purpose for which a tax is laid is public, nothing short of a moral certainty that a mistake has been made can, in my judgment, warrant the court in overruling that decision, especially when nothing better can be set up in its place than the naked opinion of the court as to the character of the use proposed."

We ask the court's attention to chapters 2712 and 2713 of laws of 1863, and section 7 of chapter 4023 of laws of 1864. These were laws authorizing aid and payment of bounties to drafted men. The constitutionality of these laws has never been questioned by our courts, so far as we have been able to discover. See *Upton* .v. *Stoddard*, 47 N. H. 168. In this case, section 7 of chapter 4023 was construed by the court, but there was no intimation that the law was not constitutional.

In conclusion, and to recapitulate, we submit the following propositions, viz.:

1. To fill a town's quota of men was a public duty, and upon the public devolved the burden of filling it.

2. In principle there is no difference, and there exists no constitutional distinction, between a law granting money to a volunteer, and one granting money to a drafted man.

3. By the passage of the act of 1874, the legislature decided that the purpose for which the money authorized by that act was to be applied was a public one, and with the power to make this decision the legislature was vested.

*Bingham & Mitchell*, for the plaintiff. Third brief.

I. The courts have either expressly or impliedly treated the votes of towns, which offered, agreed, or authorized their officers to pay bounties to volunteers, substitutes, or drafted men, as promises of such towns. *Crowell* v. *Hopkinton*, 45 N. H. 9; *Huntress* v. *Stratham*, 46 N. H. 409; *Upton* v. *Stoddard*, 47 N. H. 167; *Knowlton* v. *Sanbornton*, 48 N. H. 333; *Pittsburg* v. *Danforth*, 56 N. H. 272 (under laws of 1869, c. 126, p. 371); *Burnham* v. *Chelsea*, 43 Vt. 69; *Butler* v. *Putney*, 43 Vt. 481; *Laughton* v. *Putney*, 43 Vt. 485; *Swift* v. *Elmore*, 44 Vt. 87; *Rosebrooks* v. *Guildhall*, 44 Vt. 90; *Jackman* v. *New Haven*, 42 Vt. 591; *Gale* v. *Jamaica*, 39 Vt. 610; *Hickok* v. *Shelburne*, 41 Vt. 409; *Rogers* v. *Shelburne*, 42 Vt. 550; *Steinberg* v. *Eden*, 41 Vt. 187; *Hill* v. *Eden*, 41 Vt. 195.

II. Application upon in reduction of a town's quota of men has been held a sufficient consideration for the subsequent vote of the town to pay bounties to volunteers and drafted men. *Seymour* v. *Marlboro*, 40 Vt. 171; *Cox* v. *Mount Tabor*, 41 Vt. 28; *Swift* v. *Elmore*, 44 Vt. 87; *Rosebrooks* v. *Guildhall*, 44 Vt. 90. By the act of 1874, the defendants' vote of 1864 stood as though passed pursuant to precedent legislative authority.

III. Assumpsit is a proper action in which to enforce the plaintiff's rights and recover the money by him paid, the statute not having expressly prescribed a different remedy. See authorities *supra*, and, also, 1 Chitty Pl. 119 (16 Am. ed.); *Pawlet* v. *Sandgate*, 19 Vt. 621; *Hillsborough Co.* v. *Londonderry*, 43 N. H. 451.

The vote of the town, so far as the selectmen were concerned, was simply an instruction given them by the town. So far as the town themselves are concerned, it has a different effect: it is an appropriation of the town's funds for the purpose and to the extent specified. The vote also expressly recognizes the " amount " as " due from the town." It stands like any claim against the town, which they, through their officer, refuse to pay.

Mandamus is granted to compel an officer to discharge a legal duty, when no other adequate remedy exists. *Hall* v. *Somersworth*, 39 N. H. 511, and authorities there cited; *School-Dist.* v. *Perkins*, 49 N. H. 538. In this case the interference of the court by writ of mandamus is unnecessary, for two reasons: First, there exists an adequate remedy without it; secondly, there is not involved the failure or neglect of a legal duty by the selectmen of the defendant town, any more than there would be on the town's promissory note, or town bond, which the town through their officers had failed and neglected to pay. Dill. Cor., ss. 667, 668, notes 3 and 1, and authorities cited; *Mygatt* v. *Supervisors*, 11 N. Y. 563, and authorities cited.

IV. Assuming that the vote was a promise in law, it was not perfect until the passage of the law which gave it validity. The plaintiff had no right of action until the passage of the law, and the statute of limitations did not begin to run until the plaintiff's right of action had accrued; consequently the claim could not be barred by the statute until the lapse of six years from the passage of the law.

V. The consideration for the defendants' vote, if a consideration was essential, was the payment of $300 by the plaintiff for a cause in which every other person in town was equally interested with himself, and the application of it upon the government's claim for men against the people of the defendant town. If the defendants' quota had been promptly filled (by the people of this portion of the United States of America, commonly known as the town of Landaff), a draft would not have been necessary, and consequently the plaintiff would not have been compelled to make this sacrifice. How absurd it would be to contend that a

principal is bound to pay his debt, but his surety having paid it he cannot recover it of his principal. The enrolled men liable to draft were the sureties and guarantors for the prompt fulfilment of the several quotas. The political divisions to which assignments of quotas were made were the principals; and any one, in whatever way or from whatever cause, who made a sacrifice for fulfilment of these several quotas, made a sacrifice in a public cause, and for it is entitled to public recognition and remuneration.

VI. The effect of the law of 1874 is not to permit some towns and to compel others. Its effect is permissive. Towns which have acted, are authoritatively permitted to pay in accordance with their vote. The effect is the same whether authority is granted before or after the act. It is no more compulsion in the one case than in the other. In one case the authority precedes the act, and in the other it is subsequent to the act. The act is by authority in each case, and as much so in the one as in the other.

DOE, C. J.    In the exercise of powers which are not contested in this suit, and which include authority "to provide for calling forth the militia," congress passed the act of March 3, 1863, entitled "An act for enrolling and calling out the national forces, and for other purposes." By that act, all able-bodied men, deemed of military age, who were citizens of the United States, or had formally declared their intention to become citizens, with certain exceptions, were declared to be the national forces, liable to perform military duty in the service of the United States. "For greater convenience in enrolling, calling out, and organizing the national forces, and for the arrest of deserters and spies," the act provided that the United States should be divided into districts, of which the District of Columbia should constitute one. Where there were congressional districts, their boundaries were adopted as the lines of enrolment districts. Other parts of the country, having no congressional districts, were to be divided into enrolment districts by the president. For each district, a board of enrolment was established, to be appointed by the president. Each board was authorized to divide its district into sub-districts of convenient size, and was required to appoint for each sub-district an enrolling officer, whose duty was to enroll all persons subject to military duty. All persons thus enrolled were declared to be subject, for a certain time, to be called into the military service of the United States. The president was authorized to so assign to each district the number of men to be furnished by it as to equalize the numbers among the districts of the several states. Thereupon it was the duty of the enrolling board to make a draft. The persons drawn were to be notified to appear at a designated rendezvous to report for duty. Any person drafted and notified to appear was allowed to furnish an acceptable substitute, or pay a sum, to be fixed by the secretary of war, not exceeding $300, for the procuration of such substitute. Such per-

son so furnishing a substitute, or paying the money, was discharged from further liability under that draft. Any person failing to report, after due notice, without furnishing a substitute or paying the required sum therefor, was a deserter. Any person enrolled and drafted, who furnished an acceptable substitute, was entitled to receive from the board a certificate of discharge from such draft, which exempted him from military duty during the time for which he was drafted; and such substitute was entitled to the same pay and allowances as if he had been drafted. The president was authorized to call forth the national forces, by draft, in the manner provided in the act.

Taxation is an equal division of public expense among those for whose benefit the expense is presumed to be incurred. The cost of the war of 1861 was a public expense; but neither the cost of the plaintiff's commutation, nor any part of the duty of raising armies, was put upon the defendants by the act for enrolling and calling out the national forces. By draft, in the execution of that act, the federal government called forth as many militia-men as it thought necessary, to perform a service that was due from them to the Union. Under that act, the plaintiff, being a member of the national forces, was, by federal officers, enrolled and called out. The act operated upon the militia directly, by federal instrumentalities, and not through any state or municipal agency. For some reason, the method of calling out the militia which congress adopted was purely federal. By the statute, no duty was put, or authorized to be put, upon all the people of the districts or sub-districts, or upon tax-payers as a class. The board could form the sub-districts without regard to the boundaries of counties or towns, or school or highway districts. The adoption, by the board, of town lines for the lines of sub-districts, imposed no duty upon towns. The amendatory act of Feb. 24, 1864, passed after the plaintiff was discharged, made no change that would have affected this case if it had been passed before he was drafted. The second section of that act required the quota of each sub-district to be, not in proportion to the population or taxable property of the sub-district, but in proportion to the number of men resident therein liable to render military service. What was called the quota of Landaff was the quota of the militia of a federal sub-district.

The plaintiff was not called out in consequence of the defendants' failure to perform any duty; and his commutation did not relieve the defendants from any liability. The sum paid by him for the procuration of a substitute was not paid upon or in pursuance of any contract between him and the defendants, or upon any promise made or inducement held out by the defendants. The transaction was between the federal government, calling out the Union forces, and the plaintiff, called out by that government as a member of those forces, and electing to pay that government for the procuration of a substitute. In that affair the defendants were

not delinquent, nor a party. The plaintiff was an inhabitant of three state municipalities,—county, town, and school-district. One of them had no more federal power than the other to pay the expense of procuring a substitute for him. Neither of them was required or authorized by the United States to raise national forces, or to raise money to obtain releases of the obligations of service due to the United States from national forces whom the United States called forth. A federal duty of the plaintiff was declared and enforced by the conscription act. Neither by that act, nor by any provision of the constitution or laws of the United States, were the defendants required or authorized to perform that duty.

"Every member of the community has a right to be protected by it in the enjoyment of his life, liberty, and property. He is, therefore, bound to contribute his share in the expense of such protection, and to yield his personal service, when necessary, or an equivalent." New Hampshire Bill of Rights, Art. 12. Service was due, not merely from those who had taxable property, but from every member of the community, because every member had a right to be protected by the community in the enjoyment of life, liberty, and property. The call, made upon the plaintiff by the draft, was not caused by any fault of the plaintiff or the defendants, the sub-district or the district, the state or the federal government, the tax-payers, the able-bodied, or those who were neither tax-payers nor able-bodied, or all the people of the state. The whole population were not called to the field, because it was not necessary or expedient to call the whole, as it is not necessary or expedient to summon the whole at once to serve as jurors. Calling those who for any reason were incompetent for the work would have been maladministration. The necessary and expedient quotas of persons competent for jury service are selected by lot. The necessary and expedient quotas of persons competent for military service were selected in the same way. The plaintiff was summoned, not because he owed a service and others did not, but because, from all who owed service, as many of the competent as were wanted were properly selected by lot; and the lot fell upon him. The service which he was called to render was no less a personal service due from him, than it would have been if all had been called forth to yield the service due from all.

As the conscription act shows no congressional intention to authorize the imposition of any duty or the bestowal of any authority upon the defendants, it is not necessary to consider the question of congressional power over state municipalities. If congress could require and had required the towns of New Hampshire to perform a duty of raising troops, and the plaintiff had been drafted in consequence of the defendants' neglect of that duty, the practical operation of the delegation of power to towns by the state act of 1874 would have been to put one town's quota of a federal burden

upon their tax-payers, and to leave another town's quota of the same burden upon their conscripts. And one question would have been, whether, upon constitutional principles of equality, any New Hampshire power of legislation is capable of such an act.

When property of individuals is taken to satisfy an execution against a town, they may recover, from the town, remuneration for their compulsory payment of the town's debt. G. L., c. 239, s. 10. The legislature have not delegated to the towns the power of deciding, in such cases, whether they will indemnify the payers of their debts or not. The delegation of such power to towns might result in the payment of one town's debt by the town, and the payment of another town's debt by a property-owner selected by the sheriff. Had the power of granting and withholding indemnity been delegated, there would have been such a statutory provision for an unequal division of public burdens, as the act of 1874 would have been if the conscription act had made military service a municipal obligation.

The plaintiff contends that the defendants had a local interest in keeping their citizens at home, away from the dangers of the war. The plaintiff did not pay for the procuration of a substitute at the defendants' request, or on the defendants' promise to indemnify him. He says, in the declaration, he paid the money to avoid military service. After he paid it, the town passed the vote to pay him the same sum. The vote was passed six months after he was released from his obligation to go away; and the act of the legislature, confirming the vote, was passed nine years after the close of the war. There was no action of the town or the legislature by which the plaintiff was kept or induced to stay at home. Nothing was done, promised, or authorized, by the town or the legislature, for the purpose of keeping him at home, or preventing his going as a conscript or as a volunteer. And what effect such action or purpose would have in a hypothetical case, we need not inquire.

When the town voted, in 1864, to pay the plaintiff the sum by him paid in 1863, the town had no legal authority to pass the vote or pay the money; and this action could not have been maintained before the enactment of c. 60 of N. H. Laws of 1874. If he had had a right of action before the passage of that statute, this action would have been barred by the statute of limitations. The only question is, whether a right of action was created and given to him by that statute.

Legislative power can be delegated to towns only in local town affairs; and a public expense, not of a local character, cannot be unequally divided among the towns. The legislature cannot give towns an option of taxation for a purpose not local, and cannot compel one town to build a state-house, or state prison, or to pay more than their share of any public expense. Whether the legislature could, directly and uniformly, out of the state treasury, pay the United States the expense of procuring substitutes for national

forces called forth from New Hampshire in September, 1863, or could require all the towns to pay that expense under an equal apportionment and uniform rule, or could in any way proportionately put upon towns a duty of filling the federal ranks, is a question not raised by this case. The provision of the act of 1874 ratifying the defendants' vote, if regarded as equivalent to a delegation of legislative power to the defendants, was unauthorized, because the procuration of. substitutes for the militia called forth by the draft of September, 1863, was not a subject of local municipal legislation. And whether the ratifying provision is regarded as such an act of delegation, or as an act of the legislature making the defendants the plaintiff's debtor without such delegation, it was unauthorized because it was unequal taxation. It unequally divided among the towns an expense not of a local, municipal character. It authorized the imposition upon Landaff tax-payers of a non-local burden not put upon tax-payers in all other towns.

Raising men and money for the war was not one of the defendants' local affairs. What might legally have been done for local defence, with or without federal or state authority, if the defendants had been in danger of invasion, is not a material inquiry in this case. The war was carried on for such a purpose, and at such a distance from Landaff, that the interest, great or little, which the tax-payers of that town had in it was no more a local concern of Landaff than their interest in the recapture of New Orleans. No local interest is alleged in the declaration, and nothing that can be regarded as a local interest has been suggested in argument. The war, the act of calling out the plaintiff, the acceptance of $300 for the procuration of a substitute for him, the object to be accomplished by calling him out and accepting $300 as equivalent to a substitute, and the choice of a method of accomplishing that object, were national and not local. In contemplation of law, they were as much the business of all the people of the United States as the erection, use, and defence of a custom-house. The power of providing for the prosecution of the war was not a power of local, municipal legislation, that could be delegated by the state to the towns, and left to be used by some of them and not used by others.

The plaintiff's duty was alternative. He could perform personal service, of which the monthly pay was fixed by congress and paid by the nation, or he could furnish a substitute, or pay the nation $300 for the procuration of a substitute. The duty was not less his personal national duty than it would have been if the last two alternatives had been omitted. The conscription law made it immaterial, so far as this case is concerned, whether he joined the army, furnished a substitute, or paid $300 for the procuration of a substitute. The conscript who served was not less entitled than the plaintiff to be paid $300 by the town in which he lived. If

the plaintiff were entitled to that sum, he would have been not less entitled to it had he gone to the war. If he had answered the call by bearing arms, he would have performed his public militia duty, and not the duty of Landaff. If he had performed that duty by service instead of payment, the payment to him of $300, like his service and monthly wages, would not have been one of Landaff's local affairs. And his performance of his federal duty by payment of $300 was no more a local affair of Landaff than his performance of the same duty by personal service would have been.

The law under which he elected to pay money for the procuration of a substitute was an exercise, not of the federal power of taxation, but of the federal power of requiring the militia to perform their federal duty. And if it had been federal taxation, it would have been a division of a national expense incurred for the maintenance of the Union. It would have been taxation for a national and not for a local purpose. The expense of the war was not local in its legal character, and could not be unequally divided by a delegated state power of taxation exercised in some towns and not exercised in others. It would be immaterial whether the payment made by the plaintiff were his performance of his federal tax-paying duty, or his performance of his federal military duty by substitute. In either case, the inequality of conscripts, paid $300 in some towns for the performance of their federal duty, and not paid that sum in other towns for the performance of the same duty, could not be legally effected by a delegation of legislative power.

Whether all conscripts who performed their federal duty by personal service, or by furnishing a substitute, or by paying $300, should be paid $300 each, or any other sum for their performance of that duty, is not a local, municipal question, to be decided by and for one town in the affirmative, and by and for another in the negative. The expense of paying for the performance of that duty cannot be unequally divided among New Hampshire towns, either by the legislature or by a municipal exercise of delegated legislative power. Whatever the state can or cannot do towards an equalization of burdens, and whatever it can or cannot do towards the reward of persons who, by service or payment, perform their military or civil duty to the state or the Union, neither the power of taxation, nor any other constitutional power, can, in some towns, leave upon the national forces the national duty to which they were called in September, 1863, and in other towns transfer that duty to the tax-payers.

The judicial service of juries is a public duty which the state, by enrolment and draft, requires some of its citizens to perform. In principle, the jury conscription act (G. L., *c.* 213) and the militia conscription act of March 3, 1863, are much alike. The quotas of jurymen are assigned so that each town "may furnish its proportion of jurors in each year." Their service is compulsory, and

their compensation, like the compensation of drafted militia, is fixed by statute, and not by contract,—except so far as the constitution regards the statute as the execution of the social contract by which government is established and its power determined "when men enter into a state of society." Bill of Rights, arts. 1, 3. Whatever payment for jury service can or cannot be made by general law, operating retrospectively upon all jurors and all tax-payers of the state or of one county, or upon jurors drawn in a particular year, or for a particular term of court, or for the trial of a particular case, an act delegating to towns a legislative power of deciding whether they would or would not grant their jurors a certain remuneration would lack an essential element of uniformity. For equal service on the same panel, a Landaff juror being paid by his town, and a Haverhill juror not being paid by his town, either the former would be overpaid, or the latter would not be paid in full. The public duty of fully compensating them (Bill of Rights, art. 21) being unequally performed, would not be constitutionally performed. There would be a violation either of the Haverhill juror's constitutional right to be fully compensated, or of the Landaff taxpayers' right of contributing no more than their share of public expense. There would be an unauthorized disparity in the conditions of the jurors, and in the conditions of the tax-payers, of the two towns. A burden would be unequally divided, and the unequal division would not be taxation. Jurors and tax-payers would have cause to complain that the arbitrary discrimination was not a rule of action in a legal sense, and was not law in a constitutional sense. The governmental order given by Landaff for the transfer of property from tax-payer to juror, and not given by Haverhill, justified on no ground of local legislation, would not be a constitutional observance of equal right. And it would be immaterial whether the order, not given for Haverhill, were given for Landaff by the state, or by Landaff, wielding a so-called delegated power of the state. The delegation of the power would be a cession of a non-existing power of introducing unequal conditions.

Jury trial being a constitutional right, jury service is necessarily a constitutional duty : and protection by force as well as by jury trial being a right, military as well as civil service is a duty. The express recognition of the duty of jury service, in article 21 of the Bill of Rights, is not stronger than the recognition of the duty of military service in articles 12, 13, 16, and 24 of the Bill of Rights, and articles 51, 53, 54, and 55 of the second part of the constitution. The plaintiff's obligation of federal militia service is as indisputable as his obligation of state militia service. And for the service he rendered, he is not entitled to compensation from the defendants, as he would not have been if his call had been to federal jury service, and the act of 1874 had been an act to authorize towns to pay their citizens for such service. That act, being a provision for an unequal division of expense, is unauthorized. On

the question whether an act making an equal division would have been valid, we express no opinion.

*Demurrer sustained.*

FOSTER, J., did not sit: BINGHAM, ALLEN, SMITH, and CLARK, JJ., concurred; STANLEY, J., concurred in the result.